UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
MATTHEW WEISS,

                Plaintiff,                      **MEMORANDUM & ORDER**

        -against-                           2:22-CV-1808 (OEM) (SIL)

BETHPAGE FEDERAL CREDIT UNION,

                Defendant.
-----------------------------------------------------------------X

**ORELIA E. MERCHANT, District Judge:**

Plaintiff Matthew Weiss ("Plaintiff" or "Weiss") brings this action against Defendant Bethpage Federal Credit Union ("Defendant" or "Bethpage") for alleged violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681, *et seq*. Bethpage now moves for summary judgment on the sole remaining claim as to whether Bethpage failed to investigate Plaintiff's loan dispute in violation of the FCRA. *See* 15 U.S.C. § 1681s-2(b). For the reasons that follow, Bethpage's motion is **GRANTED**.

## BACKGROUND[1]

### A. Plaintiff's Bethpage Accounts

Bethpage "is a federal credit union that extends membership, deposit accounts, and loans to its members." Defendant's Rule 56.1 Statement ("Def's 56.1"), ECF 35, ¶ 1. Plaintiff became a member at Bethpage in 2017. *Id.* ¶ 2.

On or about July 21, 2017, Plaintiff opened a personal checking account at Bethpage (the "Personal Account"), from which he was the only person authorized to make withdrawals or transfers. *Id.* ¶¶ 3-4. Also in 2017, Plaintiff and his business partner at the time, David Giuffre

---

[1] The following facts are undisputed unless otherwise noted.

1

("Giuffre"), opened a separate business account at Bethpage for their business Selectpeo, Inc. (the "Selectpeo Account"). *Id.* ¶ 5. By July 2018, Giuffre was removed as an authorized accountholder on the Selectpeo Account, making Plaintiff the sole authorized holder on the account. *Id.* ¶¶ 6-7.

On or about April 16, 2018, Plaintiff opened a business account for Select Choice Consulting, Inc. (the "Select Choice Account") (together with the Personal Account and Selectpeo Account, the "Bethpage Accounts"), from which he was the only person authorized to make withdrawals or transfers. *Id.* ¶¶ 9-10.

**B. Disputed 2020 Bethpage Loan**

On or about March 23, 2020, a new loan was requested in Plaintiff's name through Bethpage's online portal. *Id.* ¶ 20. The parties do not dispute that the loan application originated from a user using the IP address associated with Plaintiff. *Id.* ¶ 31. However, they disagree as to whether Plaintiff himself was the actual loan applicant. Bethpage contends that it was Plaintiff who opened the loan because the IP address used to Docu-sign the Disputed Loan was the same IP address associated with Plaintiff's online activity. Def's Rule 56.1 Reply Statement ("Def's 56.1 Reply"), ECF 43, ¶ 5. Bethpage also confirmed that the phone number, mailing address, and email address used to apply for the loan matched Plaintiff's personal information it had on file. Def's Rule 56.1 ¶ 26.

However, Plaintiff claims that an unidentified third party opened the loan, using Plaintiff's information. Plaintiff's Rule 56.1 Counterstatement ("Pl's 56.1 Counterstatement") ¶ 5. Pursuant to Plaintiff's enabled security preferences associated with his Bethpage Accounts,[2] Bethpage contacted Plaintiff to determine the reason for the loan request. Def's 56.1 ¶ 21.

---

[2] Plaintiff set his security settings to require Bethpage to call his phone and receive a verbal confirmation before extending any credit or authorizing access to his accounts. Def's 56.1 ¶ 19. Plaintiff claims he "took all reasonable steps to protect his Bethpage account and personal information," including installing credit monitoring and identity

2

On or about March 24, 2020, Bethpage claims that it contacted Plaintiff to extend a counteroffer for a loan of $5,000 and sent him a letter detailing the terms of the counteroffer. *Id.* ¶¶ 22-23. Plaintiff denies receiving the letter but confirmed that the address on the letter was indeed his correct address. *Id.* ¶ 24; Pl's Response to Def's Rule 56.1 Statement ("Pl's 56.1 Response"), ECF 41-3, ¶ 24. Bethpage claims it confirmed through unspecified communications with Plaintiff that he understood the terms of the counteroffer and wanted to proceed with the loan. Def's 56.1 ¶ 25. Plaintiff disputes this because he claims he was not aware of the counteroffer and Bethpage did not confirm his personal information with him. Pl's 56.1 Response ¶ 25-26.

On April 1, 2020, the loan requester signed a Closed-End Note, Disclosure, Loan and Security Agreement for a fixed rate unsecured loan from Bethpage in the amount of $5,000 (the "Disputed Loan") electronically via Docu-sign. Def's 56.1 ¶¶ 27-28. Again, the parties dispute whether it was actually Plaintiff who signed the Disputed Loan. Plaintiff contends the signature and initials on the loan documents are not his. *Id.* ¶ 33; Pl's Rule 56.1 Counterstatement ¶ 6; Pl's 56.1 Response ¶ 27-29. Bethpage claims Plaintiff himself electronically signed the documents given that the signer used the IP address common to Plaintiff's past activity with Bethpage. Def's Rule 56.1 Reply ¶¶ 5-6; Def's 56.1 ¶ 31. Additionally, the name and address listed on the Disputed Loan matched Plaintiff's personal information Bethpage had on file. Def's 56.1 ¶ 32.

On April 1, 2020, Bethpage deposited the proceeds of the Disputed Loan into Plaintiff's Personal Account. *Id.* ¶ 34. The Disputed Loan was listed on Plaintiff's monthly Personal Account

---

theft protection software, using two-factor authentication, and attempting to change his social security number. Pl's 56.1 Counterstatement, ECF 41-4 ¶¶ 1-2. However, Bethpage disputes these allegations because they are not supported by underlying evidence beyond Plaintiff's own testimony. Def's 56.1 Reply ¶¶ 1-2. Plaintiff did not share with anyone his Bethpage log-in or security information, including his online banking username or password, which he changed "thirty times, give or take" to protect his accounts. Pl's 56.1 Counterstatement ¶ 1(f); Def's 56.1 ¶¶ 13, 17-18. Plaintiff checked his account balances for the three Bethpage Accounts about once a month online or through Bethpage's mobile application. *Id.* ¶ 15.

3

statements beginning April, 30, 2020 through July 31, 2020. *Id.* ¶¶ 36, 50-52. Plaintiff could view the Personal Account Statements using Bethpage's mobile application, which he regularly used to check his balances. Pl's 56.1 Counterstatement ¶ 10; Def's 56.1 Reply ¶ 10; Def's 56.1 ¶ 53. Plaintiff reported numerous transactions from his Personal Account as fraudulent in April 2020, but Plaintiff did not report that the Disputed Loan was fraudulent or erroneous when it was deposited. Def's 56.1 ¶¶ 37-38.

### C. Closure of the Bethpage Accounts

On June 23, 2020, Bethpage sent a letter to Plaintiff notifying him that Bethpage intended to close his Bethpage Accounts on July 22, 2020, based on a pattern of suspicious transactions between the Bethpage Accounts.[3] *Id.* ¶ 55. The letter informed Plaintiff he was still responsible to satisfy the monthly payments for the Disputed Loan. *Id.* ¶ 56.

On July 22, 2020, Bethpage sent Plaintiff a follow-up letter notifying him that his Bethpage Accounts were closed, enclosing a check for the remaining balance in the Bethpage Accounts, and reminding him that he remained responsible for paying the Disputed Loan.[4] *Id.* ¶¶ 57-58.

### D. Plaintiff Alleges Identity Theft in the 2020 Experian Dispute Package

Plaintiff claims he did not become aware of the Disputed Loan until around "November or December" of 2020, when he tried to refinance his car and received a credit report indicating the loan existed. Pl's Rule 56.1 Counterstatement ¶ 3. Bethpage disputes this is the case as it had

---

[3] Between April 1, 2020 and April 19, 2020, seven transfers were made in the amounts of $5,000 or $1,000 between Plaintiff's Bethpage Accounts. *Id.* ¶¶ 39-45. Bethpage claims that Plaintiff used funds from the Selectpeo Account for business purposes in April 2020. *Id.* ¶ 47. Plaintiff contends he did not authorize any transactions from the Selectpeo Account in April 2020. *Id.* ¶ 48.

[4] Both the June 23 and July 22, 2020, letters were sent to the mailing address Plaintiff had provided to Bethpage. *Id.* ¶ 59. Plaintiff denies seeing either letter or being informed he was responsible for paying the Disputed Loan in July 2020. *Id.* ¶¶ 60-61.

4

notified Plaintiff of the loan on multiple occasions prior to November 2020. Def's 56.1 Reply ¶ 3; *see* Background Part C, *supra*.

According to Plaintiff, when he learned of the Disputed Loan in late 2020, he immediately submitted a police report and identity theft report to Bethpage and Credit Reporting Agencies ("CRAs"), such as Experian, Trans Union, and Equifax. Pl's 56.1 Counterstatement ¶ 4; Amended Complaint, ECF 5. Bethpage disputes that Plaintiff submitted either report to Bethpage, claiming it is unsupported by evidence beyond Plaintiff's own deposition testimony. Def's 56.1 Reply ¶ 4.

On or about December 7, 2020, Plaintiff mailed a package to Experian (the "Experian Dispute Package") alleging identity theft associated with an unspecified Bethpage account. Def's 56.1 Statement ¶ 67. The Experian Dispute Package included three documents. First, the Experian Dispute Package included a Federal Trade Commission Identity Theft Report signed by Plaintiff on December 7, 2020 (the "Identity Theft Report"), which listed the same address and email address used to execute the Disputed Loan. *Id.* ¶ 68. According to the Identity Theft Report, Plaintiff discovered a fraudulent loan with Bethpage around November 2020. *Id.* ¶ 69. Second, the Experian Dispute Package also included an incident report filed with the Suffolk County Police Department on or around December 4, 2020 (the "Police Report"), which reported that the Disputed Loan was "opened from ID theft." *Id.* ¶¶ 71-72. Lastly, the Experian Dispute Package contained a letter stating Plaintiff "found some additional identity theft accounts reporting on some bureaus" and identified four "Identity Theft Accounts," including Bethpage. *Id.* ¶¶ 73-74. The Experian Dispute Package did not identify any third parties that Plaintiff suspected committed the alleged identity fraud. *Id.* ¶ 75.

### E. Bethpage Investigates Experian's Automated Consumer Dispute Verification

On or around December 10, 2020, Experian sent an Automated Consumer Dispute Verification ("ACDV") to Bethpage through E-OSCAR (Online Solution for Complete and Accurate Reporting). *Id.* ¶¶ 76-77. The ACDV contained Plaintiff's personal information and stated in the box entitled "Dispute Reason" that "Consumer claims true identity fraud – account fraudulently opened." *Id.* ¶ 78; Vazquez Declaration, Exhibit F ("ACDV Exhibit"), ECF 39-6. Bethpage did not receive the Identity Theft Report or the Police Report as part of the ACDV. Def's 56.1 Statement ¶ 79; Pl's Response to Def's 56.1 Statement ¶ 79; ACDV Exhibit.

Bethpage then began an investigation to validate the information that was provided during the loan application process against the pertinent information in its core system. Bethpage works with Shared Service Solutions, LLC ("S3"), a third-party service provider, which receives the ACDV, investigates the dispute, and responds to the CRAs on Bethpage's behalf. Def's 56.1 Statement ¶¶ 85-86; Pl's 56.1 Counterstatement ¶ 13. S3 validated the loan applicant's driver's license and personal information provided in the loan application and "closed note" agreement by comparing it to Plaintiff's member information in Bethpage's core system, including his: (i) account number; (ii) name; (iii) address; (iv) phone numbers; (v) date of birth; (vi) loan number; (vii) payment amount; (viii) payment history; and (ix) delinquency indicators. Def's 56.1 Statement ¶¶ 82-83.

Bethpage concluded that the Disputed Loan was not the result of identity theft because Plaintiff's personal identifying information was accurately associated with the Disputed Loan. *Id.* ¶ 90. On or around December 24, 2020, Bethpage responded to Experian, confirming that the Disputed Loan was accurately reported as unpaid and charged off. *Id.* ¶ 91.

### F. Plaintiff's Formal Fraud Declaration and Bethpage's Internal Review

Bethpage instructed Plaintiff to submit a formal fraud declaration, which he did on or around June 22, 2021 in the form of a "Declaration of Claimant and Letter of Circumstances" ("Plaintiff's Formal Dispute"). *Id.* ¶ 92. Plaintiff's Formal Dispute, which enclosed a copy of the Police Report, alleged unauthorized account access and fraudulent account or loan activity. *Id.* ¶¶ 92-93. Plaintiff's Formal Dispute did not identify the Disputed Loan or list any disputed account numbers, dollar amounts, or dates associated with allegedly fraudulent accounts or loans. *Id.* ¶¶ 94, 96. In Plaintiff's Formal Dispute, he alleged that his former business partner, Giuffre, opened numerous credit accounts and purchased items and subscriptions using other peoples' identity. *Id.* ¶ 98. Plaintiff testified that Giuffre had access to Plaintiff's personal information and admitted to a third party that he impersonated Plaintiff. Pl's 56.1 Counterstatement ¶ 7. However, Bethpage disputes those allegations as contrary to Giuffre's testimony stating he had not used Plaintiff's personal information to imitate Plaintiff to a financial institution. Def's 56.1 Reply ¶ 7.

On or about June 23, 2021, Bethpage opened its own internal investigation into Plaintiff's identity theft allegations. Def's 56.1 Statement ¶ 100. The investigation indicated: (1) Plaintiff was contacted directly during the Disputed Loan application process; (2) the email used to Docu-sign the Disputed Loan matched Plaintiff's business email address in Bethpage's records; and (3) the Docu-sign signature was obtained using an IP address common to Plaintiff's past online activity. *Id.* ¶¶ 101-03. Bethpage's investigation also found that the proceeds from the Disputed Loan were deposited into Plaintiff's Personal Account and used, allegedly by Plaintiff, for business purposes. *Id.* ¶¶ 47, 104. Following its investigation of Plaintiff's Formal Dispute, Bethpage informed Plaintiff's attorneys that the Disputed Loan was not the result of identity theft or fraud. *Id.* ¶ 105.

### G. Plaintiff Made No Payments on the Disputed Loan

At no time did Plaintiff make any payments on the Disputed Loan. *Id.* ¶ 63. After the first missed payment, Bethpage began reporting the delinquency to the CRAs. On or around February 24, 2021, Bethpage charged-off the Disputed Loan. *Id.* ¶ 65. On or around March 3, 2021, Bethpage assigned the Disputed Loans to its attorneys for collections. As of August 24, 2023, the date Bethpage filed its Motion for Summary Judgment, Plaintiff had not paid the charged-off balance on the Disputed Loan. *Id.* ¶ 124.

### H. Procedural History

On March 31, 2022, Plaintiff filed his initial Complaint against Bethpage. *See* Complaint, ECF 1. On May 31, 2022, Plaintiff filed an Amended Complaint, alleging two causes of action under the FCRA. *See* Amended Complaint, ECF 5. On June 14, 2022, Bethpage filed its Answer. *See* Answer, ECF 12. On May 4, 2023, Plaintiff withdrew his second cause of action. *See* Response in Opposition re: Motion for Pre-Motion Conference ("Opp. to Pre-Motion Conference"), ECF 27. Plaintiff's sole remaining cause of action alleges that Bethpage failed to investigate and delete derogatory information from Plaintiff's file after failing to verify the completeness and accuracy of that information, in violation of 15 U.S.C. § 1681s-2(b). *Id.*; Amended Complaint.

On October 10, 2023, Bethpage filed its motion for motion for summary judgment and supporting papers, and Weiss filed its opposition papers. *See* Memorandum of Law in Support Defendant's Motion for Summary Judgment ("Def.'s Memo"), ECF 34; Def's 56.1 Statement; Plaintiff's Affidavit/Declaration in Opposition of Motion for Summary Judgment filed by Plaintiff ("Pl's Opposition"), ECF 41; Pl's 56.1 Counterstatement; Pl's Response to Def's 56.1 Statement. On October 11, 2023, Bethpage filed its reply to Plaintiff's memorandum and Rule 56.1

8

Counterstatement.  *See* Defendant's Reply to Response to Motion for Summary Judgment, ECF 42; Def's 56.1 Reply Statement.

## STANDARD OF REVIEW

The Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In deciding a motion for summary judgment, the Court must "view the evidence in the light most favorable" to the nonmoving party, "to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004).  Summary judgment is not warranted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Once the moving party has met its initial burden of establishing that no material facts preclude judgment as a matter of law, the nonmoving party must raise "specific facts" showing that there is a genuine issue for trial. *Matsuhita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (holding the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts").  "[U]nsupported allegations do not create a material issue of fact." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000).

## DISCUSSION

Bethpage argues that the undisputed evidence shows Bethpage reasonably investigated Plaintiff's identity theft claim as required and that it reported no inaccuracies to CRAs.  It further argues that Plaintiff has not introduced any evidence creating a genuine issue of material fact to preclude summary adjudication.  The Court agrees.

9

### A. Duties of Furnishers under the FCRA

The FCRA imposes several duties on "furnishers" of information to CRAs.[5] 15 U.S.C. § 1681s-2; *see also* 12 C.F.R. § 1022.41(c) (defining "furnisher"); *DeSiena v. Pennsylvania Higher Educ. Assistance Agency*, 22-CV-1956, 2023 WL 4044109, at *1 (2d Cir. June 16, 2023) (summary order). Section 1681s-2(a) requires furnishers to provide CRAs with accurate information about their consumers. 15 U.S.C. § 1681s-2(a). Section 1681s-2(b) provides that furnishers must "reasonably investigate" upon receiving notice from a CRA of a dispute regarding the completeness or accuracy of reported information. *Longman v. Wachovia Bank*, N.A., 702 F.3d 148, 151 (2d Cir. 2012) (citing 15 U.S.C. §§ 1681i(a)(1)(A), 1681s–2(b)).

### B. Bethpage Reasonably Investigated Plaintiff's Identity Theft Claim Made in the ACDV

To prevail on an unreasonable investigation claim under 15 U.S.C. § 1681s-2(b), a plaintiff must establish that a furnisher: (1) received notice of a dispute from a CRA and (2) thereafter acted in "willful or negligent noncompliance with the statute." *Rubin v. HSBC Bank USA, NA*, 20-CV-4566 (FB), 2024 WL 649916, at *2 (E.D.N.Y. Feb. 16, 2024) (citing *Markovskaya v. Am. Home Mortg. Servicing, Inc.*, 867 F. Supp. 2d 340, 343 (E.D.N.Y. 2012). If the furnisher's "investigation finds that the information is incomplete or inaccurate, [it must] report those results to all other" CRAs. 15 U.S.C. § 1681s-2(b)(1)(D). Accordingly, furnishers have a statutory duty to "investigate disputed information after receiving notice of a dispute concerning the completeness or accuracy of information from a CRA." *See Burns v. Bank of Am.*, 655 F. Supp. 2d 240, 250 (S.D.N.Y. 2008).

---

[5] Here, no party disputes that Bethpage is a "furnisher" under FCRA. *See* Motion for Summary Judgment; Opposition Motion.

Here, there is no dispute that Bethpage received notice of the Disputed Loan from a CRA through Experian's ACDV in December 2020.  Def's 56.1 Statement ¶¶ 76-77.  Therefore, the only question at issue before the Court is whether Bethpage willfully or negligently violated the FCRA by failing to reasonably investigate the disputed information provided to it by Experian as the statute requires.  *See DeSiena*, WL 4044109, at *1 ("[F]urnishers must 'reasonably investigate' upon receiving notice of a dispute regarding the completeness or accuracy of reported information.").

Courts employ an objective reasonableness standard for determining the adequacy of a furnisher's investigation.  *See Rubin*, 2024 WL 649916, at *3; *see also DeSiena*, 2023 WL 4044109, at *1 (quoting *Longman*, 702 F.3d at 151).  That is, the reasonableness of the furnisher's investigation is determined "in light of what the furnisher learned about the nature of the dispute from the description in the CRA's notice of dispute."  *Rubin*, 2024 WL 649916, at *3 (quoting *Frederick v. Cap. One Bank (USA), N.A.*, No. 14-CV-5460 (AJN), 2018 WL 1583289, at *7 (S.D.N.Y. Mar. 27, 2018)); *see also Chiang*, 595 F.3d 26 at 38.  "[W]here a given notice contains only scant or vague allegations of inaccuracy, a more limited investigation may be warranted." *Napoleon v. 5665 Sunrise Highway Corp.*, No. 18-CV-05703 (DG) (SIL), 2021 WL 3469991, at *9 (E.D.N.Y. July 7, 2021) (quoting *Seamans v. Temple Univ.*, 744 F.3d 853, 865 (3d Cir. 2014)) (granting summary judgment for furnisher)).  Thus, the scope and, necessarily, the adequacy of an investigation, turns on the information provided by the CRA to the furnisher. *See Jenkins v. Capital One, N.A.*, No. 14-CV-5683 (SJF) (AKT), 2017 WL 1323812, at *6 (E.D.N.Y. Feb. 28, 2017) ("The reasonableness of a furnisher's investigation depends upon the nature and scope of the consumer's dispute to the CRA."); *Okocha v. HSBC Bank USA, N.A.,* 08-CV-8650 (MHP), 2010 WL 5122614,

11

at *5 (S.D.N.Y. Dec. 14, 2010) (examining the reasonableness of a furnisher's investigation based on "what it was told by the credit bureau").

"Generally, the question of reasonableness in FCRA cases presents a fact question for the jury." *Rubin*, 2024 WL 649916, at *3. However, no reasonable jury could return a verdict for Plaintiff based on the undisputed facts here. The undisputed facts show that Bethpage received a factually sparse ACDV notice from Experian which only contained Plaintiff's personal and pedigree information and stated in the box entitled "Dispute Reason" that "Consumer claims true identity fraud – account fraudulently opened." Def's 56.1 ¶ 78; ACDV Exhibit. Bethpage did not receive the Identity Theft Report or the Police Report as part of the ACDV. Def's 56.1 ¶ 79; Pl's 56.1 Response ¶ 79.

Bethpage's investigation of the ACDV based on this scant information is objectively reasonable as a matter of law. In response to the ACDV Experian sent to Bethpage, which relayed Plaintiff's concerns about "true identity fraud" related to a "fraudulently opened account," S3, acting on Bethpage's behalf, validated the information provided during the Disputed Loan's application[6] process against the information on Bethpage's core system, including Plaintiff's: (i) account number; (ii) name; (iii) address; (iv) phone numbers; (v) date of birth; (vi) loan number; (vii) payment amount; (viii) payment history; and (ix) delinquency indicators. Def's 56.1 ¶ 67-68, 81-84. Thus, Bethpage's investigation was sufficient as a matter of law because (1) it was based on the nature of the dispute – a loan purportedly taken out by someone other than Plaintiff – as

---

[6] The Court notes that the language used in the ACDV uses the term "account" in reporting the "account fraudulently opened." On its face, the ACDV could then mean the fraudulent opening of an account such as the Bethpage Accounts or alternatively mean the taking out of the Dispute Loan, which is what Plaintiff and Defendant take it as. Opposition Motion at 5; Def's 56.1 Statement ¶¶ 78, 88, 90-91. Taking the inference in favor of Plaintiff as the non-moving party, the Court infers that the ACDV means to reference the Disputed Loan given that the terminal account numbers provided in the ACDV (-8882) match the terminal account numbers associated with the Disputed Loan on the Plaintiff's monthly Personal Account statements and are distinct from the terminal numbers associated the Personal Account (-1248). *See* Def's 56.1 ¶¶ 36, 50-52; ACDV Exhibit.

described in Experian's ACDV and (2) Bethpage verified the information in the loan application, which it had reported to Experian as accurate, indeed matched its internal records. *See, e.g., DeSiena*, 2017 WL 1323800, at *12 (finding investigations reasonable where the furnisher verified "that the information in its own files was consistent with that which it reported to the [CRAs]"); *Llewellyn v. Asset Acceptance, LLC*, No. 14-CV-411 (NSR), 2015 WL 6503893, at *8 (S.D.N.Y. Oct. 26, 2015) (finding investigations reasonable where the furnisher "review[ed] all of its records pertaining to the account" to confirm that the information it reported to the CRAs "matched its internal records").

Moreover, the lack of any additional supporting facts captured by the ACDV beyond its barebones statement sets the bar lower for what an objectively adequate investigation requires. *See Napoleon*, 2021 WL 3469991, at *9. For example, other courts have granted summary judgment to furnishers where the complainant generally disputed his ownership of an account but did not identify a specific inaccurate item in his credit reports. *See Jenkins*, 2017 WL 1323800, at *11, 12 (reasoning that the furnisher's investigations, which verified plaintiff's account information, were reasonable under the FCRA); *cf. Rubin*, 2024 WL 649916, at *3 (denying the defendant's motion for summary judgment because the plaintiff provided specific evidence supporting his claims, including GPS data indicating he was not at the location where and when the allegedly fraudulent charge was made). Again, the broad and general statement in the ACDV that Plaintiff claimed the Disputed Loan account was "fraudulently opened" provides little for a furnisher to go off of to investigate further. Def's 56.1 ¶ 78; ACDV Exhibit.[7]

---

[7] Bethpage did not receive the Identity Theft Report or the Police Report as part of the ACDV. Def's 56.1 Statement ¶ 79; Pl's Response to Def's 56.1 Statement ¶ 79. Even if Bethpage had received the Identity Theft Report or the Police Report with the ACDV, its investigation would still have been reasonable. Neither report contained information that would have required Bethpage to expand the scope of its investigation beyond what it did in response to the ACDV. The Identity Theft Report states only that "fraudulent accounts or charges appear on my credit report." Def's

Lastly, Plaintiff introduces no evidence that creates a genuine issue as to the reasonableness of this investigation that requires a jury. Plaintiff swears in his affidavit that he did not request the loan or sign the loan documents and "an as-yet unidentified third party did, using Weiss' information." Pl's 56.1 Counterstatement ¶ 5-6. However, Plaintiff provided no admissible evidence beyond his own testimony to support this speculative contention. *Id*. In such cases, the Second Circuit has held that a plaintiff's own affidavit asserting that she did not sign a loan application, "without more," does not demonstrate that the furnisher failed to conduct a reasonable investigation. *See DeSiena*, 2023 WL 4044109, at *2 (finding no genuine dispute as to any material fact because the undisputed facts demonstrated the furnisher reasonably investigated the plaintiff's fraud claim by reviewing plaintiff's relevant account history and information on file).

Given the foregoing, the Court finds that there is no dispute of material fact that Bethpage conducted an adequate investigation as required by the FCRA. Accordingly, the Court grants Defendant summary judgment on this issue.

### C. There Is No Evidence that Bethpage Reported Inaccurate Information

Plaintiff also argues that Bethpage violated the FCRA by reporting "inaccurate and fraudulent" information about the Disputed Loan to CRAs and then failing to delete or correct such derogatory information. Amended Complaint ¶ 23-24. However, no facts support the proposition that the information Bethpage reported to CRAs regarding the Disputed Loan was inaccurate. The Second Circuit has held that "claims under the FCRA require factual inaccuracies to be actionable." *Mader v. Experian Info. Sols., Inc.*, 56 F.4th 264, 270 (2d Cir. 2023); *see also*

---

56.1 Statement ¶ 70; Vazquez Declaration, Exhibit E ("Pl's Formal Dispute Exhibit") at 2, ECF 39-5. The Police Report states generally that "a Bethpage Account" with an account number ending in 8882 is "opened from ID theft." Def's 56.1 Statement ¶ 72; Pl's Formal Dispute Exhibit at 4. Thus, neither report would have provided additional information beyond the sparse facts already stated in the ACDV.

14

*Fashakin v. Nextel Commc'ns,* No. 05-CV-3080 (RRM), 2009 WL 790350, at *11 (E.D.N.Y. Mar. 25, 2009) (considering the threshold question of whether "plaintiff has established that her credit report, including the disputed . . . debt, was, in fact, inaccurate"). After conducting its investigation in response to the ACDV, Bethpage replied to Experian that the Disputed Loan was accurately reported as unpaid and charged off. Def's 56.1 Statement ¶ 91. As noted above, Plaintiff has not presented any evidence other than his own testimony to demonstrate that the Disputed Loan was a result of identity theft and Bethpage reported it inaccurately to CRAs. *See* Pl's 56.1 Counterstatement ¶ 5-6; Discussion Part B, *supra*.

No reasonable jury could find that the information Bethpage reported to CRAs, stating the Disputed Loan was unpaid and charged off, was inaccurate. Thus, as a matter of law, Bethpage had no obligation under the FCRA to delete or correct such information, and the Court grants Defendant summary judgment on this issue.

## CONCLUSION

For the reasons stated above, Defendant's motion for summary judgment **GRANTED** in its entirety. The Clerk is ordered enter judgment and close this case.

**SO ORDERED.**

/s/ Orelia E. Merchant
ORELIA E. MERCHANT
United States District Judge

Dated:   July 16, 2024
         Brooklyn New York

15